# Illinois Official Reports

## Appellate Court

---

### *In re Estate of Mankowski*, 2014 IL App (2d) 140154

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF WALTER MANKOWSKI (Susan Mankowski, as Special Administrator of the Estate of Walter Mankowski, Plaintiff-Appellee, v. Keith Nemec and Total Health Institute, P.C., Defendants-Appellants). |
| District & No. | Second District<br>Docket No. 2-14-0154 |
| Filed | December 24, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The jury's award for decedent's estate in a wrongful death action alleging that defendants were negligent in caring for decedent was affirmed on appeal over defendants' contentions that plaintiff was improperly appointed as special administrator and the Wrongful Death Act claims were nullities, that trial court errors warranted vacating the judgment and that the damage award should be reduced. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 11-L-276; the Hon. Margaret J. Mullen, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Terrence J. Madden and Tina M. Paries, both of Bryce Downey & Lenkov LLC, of Chicago, for appellants.<br><br>Margaret Morrison Borcia, of Morrison & Morrison, P.C., of Waukegan, for appellee. |

Panel                    JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Justice Zenoff specially concurred, with opinion.
Justice McLaren specially concurred, with opinion.

**OPINION**

¶ 1       On March 30, 2009, Walter Mankowski was admitted to the hospital following an eight-day inpatient treatment stay at the Total Health Institute (the Institute), and he subsequently died. On March 25, 2011, Walter's wife, Susan Mankowski, as special administrator of the estate of Walter Mankowski, and Walter's son, David Mankowski, filed a complaint alleging that defendants, Keith Nemec, D.C., and the Institute, acted negligently in providing care for Walter. As amended, the complaint sought relief pursuant to the Wrongful Death Act (the Act) (740 ILCS 180/1 *et seq.* (West 2008)) and alleged breach of contract. The contract claim was later voluntarily dismissed, leaving Susan as the only plaintiff. A jury found in favor of plaintiff and assessed damages of $2,522,847. The trial court entered judgment on the jury's verdict, plus costs. Defendants filed a posttrial motion, which, following a hearing, the trial court denied. Defendants filed a timely notice of appeal, raising three central contentions: (1) the trial court's appointment of plaintiff as special administrator was improper, and therefore the judgment should be vacated because it was entered on Wrongful Death Act claims that were nullities; (2) alternatively, this court should remand for a new trial because of trial court errors; and (3) alternatively, this court should reduce the award of damages. We affirm.

¶ 2                                    I. BACKGROUND
¶ 3       According to the complaint, on or about March 3, 2009, Walter was a patient at Skokie hospital and was diagnosed with stage IV gastric carcinoma with metastasis to his liver. The family decided to pursue alternative treatments to chemotherapy. They viewed the Institute's website and met with Nemec. Nemec indicated that four weeks of treatment would cost $22,847; David agreed and paid for the treatment. Walter was discharged from the hospital on March 20, 2009, and admitted to the Institute on March 23, 2009. While at the Institute, Walter's condition deteriorated, and on March 30, 2009, David transported Walter back to the hospital, where Walter later died, on April 7, 2009.

¶ 4       On March 25, 2011, Susan and David filed a four-count complaint against defendants. The caption identified the complaint as being brought by "Susan Mankowski, Special Administrator of the Estate of Walter Mankowski, deceased, and David Mankowski." Count I alleged a cause of action sounding in negligence pursuant to the Act (740 ILCS 180/1 *et seq.* (West 2008)) and was brought by Susan against Nemec. Count II was similar to count I but was brought by Susan against the Institute. Counts III and IV alleged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 (West

2008)) but were later dismissed. Count III was amended to allege breach of contract against Nemec, but was later voluntarily dismissed. Thus, Susan was the only plaintiff remaining.

¶ 5 On September 10, 2013, plaintiff filed a motion seeking leave to file a petition for the appointment of a special administrator. Plaintiff acknowledged that, in a wrongful death action, first the administrator of the decedent's estate should be appointed and then the action filed, but she alleged that the failure to do so was not fatal to her wrongful death action, citing *Nagel v. Inman*, 402 Ill. App. 3d 766 (2010). Plaintiff also requested that the appointment relate back to when the suit was filed, citing *Nagel* and *Jablonski v. Rothe*, 287 Ill. App. 3d 752 (1997).

¶ 6 Also on September 10, 2013, defendants filed a motion to dismiss the action pursuant to sections 2-619(a)(1) and (a)(2) of the Code of Civil Procedure (the Code) (735 ILCS 5/2-619(a)(1), (a)(2) (West 2012)). Defendants argued that, although the caption always identified plaintiff as "Special Administrator of the Estate of Walter Mankowski, deceased," there were no factual allegations in the complaint itself relating to plaintiff's appointment as special administrator nor was there attached to the complaint any order appointing her. Defendants argued that plaintiff had no standing or right in her individual capacity to file a wrongful death action on behalf of Walter. Defendants argued that, because "Susan Mankowski, Special Administrator of the Estate of Walter Mankowski, deceased" did not exist, the original complaint was improperly filed, the complaint was void *ab initio*, and the trial court never had subject matter jurisdiction over the claims. Defendants further argued that, after David's claim in count IV of the original complaint was dismissed, on November 3, 2011, no valid claims remained; since no appeal was taken, the present action terminated and the order permitting the filing of an amended complaint was void and the current pleading a legal nullity. Defendants concluded that, because no special administrator was appointed before the action was filed, and because the action thus was invalid, any subsequent attempt to add a special administrator could not relate back and should fail.

¶ 7 The parties fully briefed the issue, and, following a hearing, the trial court denied defendants' motion to dismiss; granted plaintiff leave to file her petition for appointment as special administrator; granted her petition; and entered an order appointing her as special administrator, for the purpose of prosecuting the present action.

¶ 8 Before trial, the trial court issued the following rulings on specific motions *in limine* pertinent to this appeal: (1) barring the admission of defendants' exhibits Nos. 5 and 6, which were copies of a statement by the Institute, signed by Walter and David when Walter entered the Institute; (2) barring any claim or reference during the trial to fraud by the Institute; and (3) permitting plaintiff's expert witness Tracey Thomas to give opinions during the trial.

¶ 9 The case proceeded to a jury trial on September 24, 2013. After opening statements, defendants asked the trial court to reconsider its ruling on plaintiff's motion *in limine* regarding the statement signed by Walter and David. The statement reflected, "We do not treat any disease or condition at the Total Health Institute." Plaintiff responded that the statement was irrelevant because it was not a release. The trial court determined, as it had before, that the statement had no relevance if it was not asserted to be a release. The trial court further stated, "under the balancing of Rule 403, any probative value was substantially outweighed by the prejudice concerning the document," and upheld its prior ruling.

¶ 10 Plaintiff called Christopher Holland, who was the senior pastor for the Seventh-Day Adventist church in Gurnee. Walter was a member of the church. Holland testified that

- 3 -

Walter knew how much time he had left to live and that he planned for a new house and a few trips. Holland saw Walter just before Walter's admission to the Institute and he testified that Walter appeared to be in good health and "under his own power got into the vehicle." Holland saw Walter again on March 30, 2009, after his time at the Institute, and he observed that Walter had "sunken cheeks, labored breathing" and "looked like he was about to die."

¶ 11    Nemec next testified as an adverse witness. Nemec was a licensed chiropractic physician and he did business under the name of Total Health Institute. His website stated that the Institute was "one of the leading alternative healing facilities in the country," where "[t]housands of patients have been restored to their total health and overcome cancer, *** to name a few." There were inpatient and outpatient programs, but there were no medical doctors affiliated with the Institute in March 2009. Nemec typically saw inpatients three times per week, but, aside from that, there were no other medical professionals monitoring the patients. Nemec recalled that Walter was enrolled in a four-week inpatient fasting detoxification program. Nemec knew that Walter had cancer, but he did not inquire further. He did not request any medical records or speak to any of Walter's physicians. Walter's kidneys were functioning fairly normally when he was admitted. Nemec gave Walter an "exam" on March 23, 2009, which was a "treatment" to rebalance his neurological levels. On March 25, 2009, Nemec gave Walter another treatment and wrote a comment that the "[p]atient felt better." On March 28, 2009, Nemec wrote "no change" and performed an adjustment to balance Walter's nervous system. It appeared that Walter received two colonic hydrotherapy and two lymphatic sessions while he was an inpatient. Walter also received a nutritional program with supplements.

¶ 12    Nemec denied knowledge of Walter's alleged vomiting, severe abdominal pain, or bloody diarrhea. Nemec recalled that Walter had jaundice when he arrived at the Institute but that otherwise he was walking without assistance and "cognitive." On Friday, he received a call from his staff relaying that Walter seemed a little more fatigued and had "brain fog," described as confusion caused by the detox products. Nemec did not see Walter on Friday or call a medical doctor on Friday or Saturday. Nemec recalled getting a phone call from David on Saturday, indicating that Walter seemed to be getting worse, and Nemec's response was to "just watch him." David called Nemec a couple of times on Sunday, indicating that Walter was getting worse. Nemec did not see Walter on Sunday. At approximately 2 a.m. on Monday, David called Nemec and said that he was taking Walter to the hospital. Nemec went to the Institute and saw Walter being helped into a car.

¶ 13    Dr. Leon Dragon, an oncologist, testified as an expert witness. Dragon reviewed Walter's records from his hospital stays before and after his stay at the Institute. Dragon also reviewed Walter's records from the Institute. Based upon Dragon's review, the records from the first hospitalization reflected some evidence of compromised liver function, but Walter was not in liver failure and he was ambulatory, lucid, alert, and fully functional. Walter also had virtually normal kidney function. Dragon opined that the median life expectancy of a person with Walter's condition was approximately 11 months.

¶ 14    Dragon reviewed the records upon Walter's second admission to the hospital and noted that Walter was basically bedridden, was confused, had no urine output, and was experiencing kidney failure. Dragon opined that the therapy that Walter received at the Institute resulted in "intravascular volume depletion and renal failure." Dragon further opined

- 4 -

that Walter's cause of death was primarily renal failure and that Walter's cancer did not cause the renal failure.

¶ 15    David testified regarding his memories of his time with Walter. David also testified regarding his family's decision to engage the services of Nemec and the Institute. David recalled that the website reflected a price of approximately $18,000, but, when he inquired further, the receptionist indicated that the four-week treatment program would cost $22,847. David asked why, and the receptionist indicated that it was because of Walter's diagnosis of cancer. David also spoke with Nemec about the need for a cashier's check to reserve Walter's place at the Institute. David recalled, "it was almost like in effect like if a salesman is trying to get you to buy something and he fears he's going to lose the sale and he tells you, okay, if you go–if you come back, it's going to be gone." On Friday, March 20, 2009, David drove to the Institute and dropped off a cashier's check for the full amount, and the receptionist indicated that Walter could be admitted the following Monday, March 23.

¶ 16    David offered to provide Walter's medical records to Nemec but Nemec declined. Nemec also declined David's offer for Nemec to speak with Walter's medical doctors. David was called to stay with Walter for the first weekend, and he observed that Walter appeared to be in a "stupor" and "basically just nodded." David testified that Walter deteriorated throughout the weekend. David finally took him to the hospital at approximately 2 a.m. the following Monday.

¶ 17    Following a brief recess, defendants moved for a mistrial, based on a purported violation of the trial court's order barring any claim of fraud or deception on the part of defendants. Defendants referenced David's testimony that the price of services changed and that Nemec "was like a salesman trying to close a deal." Plaintiff responded that defense counsel failed to object during the testimony and that, further, the testimony did not rise to the level of a claim of fraud. The trial court noted that defense counsel failed to object and that fraud was not implied by either David or plaintiff's counsel. Thus, it denied defendants' motion for a mistrial.

¶ 18    Walter's daughters, Ruth Ann Tallman and Sarah Marie Goodman, testified regarding their memories of Walter and engaging the services of Nemec and the Institute.

¶ 19    Dr. David Johnson, a chiropractic physician, testified as an expert witness for plaintiff. Johnson reviewed Walter's records from the hospital and the Institute and the deposition testimony of David, Dragon, Dr. Robert Hozman, who was Walter's treating internist, and Thomas, a naturopathic oncology provider. He also reviewed the supplements given to Walter at the Institute and the Institute's website. Johnson opined that Nemec should have been aware of Walter's susceptibility to dehydration. Johnson also opined that Nemec breached the standard of care by: treating Walter without coordinating with his medical doctors; advising Walter and his family that the fasting and detoxification program could heal him; failing to recognize that Walter had severely decreased liver function upon his admission to the Institute; failing to review Walter's medical history; failing to know that the treatments he gave to Walter were contraindicated for a patient with severely decreased liver function; failing to consult with experts and medical doctors; failing to properly monitor Walter with qualified medical personnel; failing to see, examine, or transfer Walter to the hospital on Friday when he learned that Walter was having problems getting up and getting around; failing to see, examine, or transfer Walter to the hospital on Sunday; treating Walter; failing to consider Walter's condition and modify his treatments; failing to obtain informed

consent; and failing to inform Walter and his family that chemotherapy was the best option to prolong Walter's life. Johnson concluded that all of Nemec's breaches of the standard of care were proximate causes of Walter's kidney failure and death.

¶ 20    Hozman testified by video deposition. When Walter was first admitted to Skokie hospital from March 10 to March 23, 2009, he suffered from gastric carcinoma with a secondary spread to the liver. Hozman told the family that Walter had six to eight months to live without chemotherapy. Hozman recalled that the family wanted to explore alternative options; Hozman did not believe that this was a good idea. Walter was brought back to the hospital on March 30, 2009, with gastrointestinal bleeding and acute renal failure. Hozman opined that dehydration was a proximate cause of the renal failure and that the renal failure was a proximate cause of Walter's death.

¶ 21    Dr. Richard Quigg also testified by video deposition. Quigg was a nephrology expert retained by plaintiff as an expert witness. Quigg believed that Walter had obstructive jaundice and was at risk for acute renal failure or injury. When Walter came to the emergency room on March 30, 2009, he was suffering from acute renal failure. Quigg opined that Walter's renal failure began on March 26, 2009.

¶ 22    Plaintiff testified regarding her relationship with Walter. After Walter's diagnosis, the children did some Internet research of alternative treatments for cancer and found the Institute. She did not visit the Institute and did not accompany Walter when he was admitted.

¶ 23    Plaintiff rested, and Dr. Jose Arruda testified as an expert witness on behalf of defendants. Arruda was the chief of nephrology at the University of Illinois in Chicago. He reviewed Walter's records from his two hospitalizations, his records from the Institute, and the depositions of Nemec, Quigg, and Thomas. He opined that Walter's liver was replaced by tumors and severely impaired. Arruda further opined that Walter had only one to two months to live. Arruda opined that Walter's cause of death was disseminated terminal cancer and that the kidney dysfunction was a bystander, *i.e.*, he died in renal failure, not from renal failure.

¶ 24    Nemec testified regarding his background in chiropractic medicine. He testified that the scope of the Institute's practice was to heal the body, mind, and spirit. Nemec testified that he did not treat any symptoms, conditions, or diseases; he and the Institute only balance health. Nemec denied telling the Mankowskis that he treated cancer or that he could cure Walter's cancer. He was aware of Walter's diagnosis, but Nemec's purpose was only to balance his health. Nemec testified regarding the services provided to Walter, including nutritional meals of seed milk and avocado soup; colonic hydrotherapy; lymphatic drainage; and examinations, which included checking for blockages in the nervous system and rebalancing those blockages. Nemec also performed chiropractic adjustments on Walter.

¶ 25    Nemec testified that he saw Walter on Monday (March 23, 2009), Wednesday (March 25), and Saturday (March 28); Walter never complained to Nemec about anything, including experiencing diarrhea. Walter was experiencing a little brain fog from the detoxification program on Friday, March 27. Nemec denied that David told him about Walter's experiencing diarrhea; their focus was on Walter's getting weaker. Nemec never discouraged David from taking Walter to the hospital. Nemec opined that he complied with the standard of care in his treatment of Walter.

¶ 26    Dr. Kenneth Micetich testified as an expert witness on behalf of defendants. Micetich was an oncologist at Loyola Medical Center. Micetich reviewed Walter's records from his two hospitalizations, his records from the Institute, and the depositions of Nemec, Dragon,

Arruda, and Quigg. Micetich opined that Walter's life expectancy was 6 to 12 months. Micetich opined that nothing at the Institute contributed to Walter's deterioration and that his worsening health was the natural progression of his cancer, which was severely involved in his liver.

¶ 27 Following Micetich's testimony, defendants proceeded with an offer of proof to introduce their exhibits No. 5 and No. 6. Both exhibits were captioned "Statement of non-medical non-treatment facility"; exhibit No. 5 reflected David's signature and exhibit No. 6 reflected Walter's signature.

¶ 28 Shelli Carlson, a colon hydrotherapist, testified that she had performed colonic hydrotherapy on inpatients at the Institute. She did not recall whether she performed the procedure on Walter. She reviewed her schedule and testified that she would have kept personal notes, but that they no longer existed.

¶ 29 Dr. John Zrelak testified that he was a chiropractic physician. He reviewed Walter's records from his two hospital stays, his records from the Institute, and the depositions of Nemec, David, Hozman, Dragon, Quigg, and Arruda. He opined that the ingredients in the Institute's supplements, including cayenne pepper, ginger root, gingko, and distilled water, were not harmful to patients. He opined that none of the supplements caused injury to Walter. He further opined that none of the food substances given to Walter caused him injury. Zrelak opined that the colonic hydrotherapy did not cause dehydration to Walter. Zrelak further opined that Nemec acted within the standard of care in treating Walter.

¶ 30 On rebuttal, plaintiffs called Thomas. Thomas was licensed as a physician in Oregon, but not in Illinois. She was part of an integrated care team, which also included a medical oncologist, a registered dietitian, a nurse, and a nurse care manager, at Cancer Treatment Centers of America in Zion. Part of her job was to work with the oncologist and determine whether any natural supplements, vitamins, or diet was appropriate for a patient, based upon the patient's condition. Thomas reviewed Walter's records from the Institute, which included copies of the supplement labels, and the depositions of Hozman, David, and Nemec. Thomas opined that Walter should not have been a candidate for colonic cleansing or any detoxification program. Thomas opined that the combination of all of the treatments Walter received from the Institute was a cause of Walter's dehydration, which ultimately led to his renal failure.

¶ 31 At this point, defendant objected to Thomas's ability to give opinions, stating that they were all speculation and conjecture. Plaintiff responded that Thomas's opinions were the basis of Johnson's testimony in that Johnson relied on Thomas's opinions to say that Walter was dehydrated and that the colonics and other treatments caused dehydration. Plaintiff further asserted that Thomas had the knowledge, experience, and training to assist the fact finder. The trial court determined that her testimony was relevant, describing it as "a link in the chain in her opinion, [and] it's part of someone else's opinion." The trial court overruled the objection and allowed the testimony.

¶ 32 Thomas continued, testifying that in her practice of working with cancer patients she had never recommended a colonic for them. She reviewed the ingredients in the supplements from the Institute and noted which ones might have had a harmful effect on Walter, such as curcumin and glutathione. Thomas opined that the fasting and detoxification program had no effect on his cancer and could not have prolonged his life.

¶ 33     The trial court reviewed the exhibits and conducted a jury instructions conference. Defendants objected to plaintiff's jury instruction No. 16, which reflected that, if the jury found in favor of plaintiff on the question of liability, it could not limit her damages "resulting from this occurrence because any injury resulted from a pre-existing condition which rendered the Plaintiff more susceptible to injury." Defense counsel argued that the instruction was not appropriate, because Walter had a terminal diagnosis and was likely to die within six to eight months, and the instruction would improperly permit the jury to award damages based on a much longer life expectancy. The trial court ruled that there were disparate opinions about what the life expectancy could or might have been, so it gave the instruction over defendants' objection.

¶ 34     After plaintiff's counsel presented her closing argument, defense counsel moved for a mistrial. Defense counsel argued that plaintiff's counsel violated the ruling barring her from making any claim or reference to fraud by defendants. Defense counsel asserted that, during closing argument, plaintiff's counsel argued that Nemec operated under the "guise" of a spiritual leader. Defense counsel argued that the term "guise" was intended to suggest fraud and deception. The trial court noted that defense counsel failed to object, and therefore it was not able to address the matter with the jury. The trial court further stated that the tenor of plaintiff's argument was directed toward showing a purported breach of the standard of care and rebutting the defense that treatment was not offered. The trial court denied defendant's motion for a mistrial, and thereafter the parties resumed closing arguments.

¶ 35     The trial court instructed the jury, and, after deliberations, the jury found in favor of plaintiff and against defendants. The jury assessed damages of $2,522,847. The trial court entered judgment on the jury's verdict, plus costs.

¶ 36     Defendants filed a posttrial motion, and the trial court conducted a hearing on January 21, 2014. One of the issues concerned the amount of damages awarded. Defendants argued that a $2.5 million award was excessive because the evidence established that Walter was not likely to live more than one year. After hearing arguments, the trial court denied the motion. In doing so, the trial court commented that the verdict did not "shock[ ] the conscience." The trial court found that the verdict was not the effect of "passionate prejudice," and the court had "the firm conviction that [the verdict] was within the evidence related to the value of the plaintiffs' remaining family life which was remarkable, and so it was within the discretion of the jury to make a fair and reasonable compensation."

¶ 37     Defendants filed a timely notice of appeal.

¶ 38                                    II. ANALYSIS

¶ 39     Defendants contend that the trial court's appointment of Susan as special administrator was improper and that therefore the judgment should be vacated because it was entered on Wrongful Death Act claims that were nullities. In the alternative, defendants request a new trial because of trial court errors, and, also in the alternative, defendants ask this court to reduce the award of damages.

¶ 40     Defendants brought a motion to dismiss the action pursuant to sections 2-619(a)(1) and (a)(2) of the Code (735 ILCS 5/2-619(a)(1), (a)(2) (West 2012)). A section 2-619 motion "admits the legal sufficiency of the complaint, but asserts affirmative matter outside the complaint that defeats the cause of action." *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351,

361 (2009). Subsection (a)(1) provides for dismissal when the court lacks subject matter jurisdiction. 735 ILCS 5/2-619(a)(1) (West 2012). Subsection (a)(2) provides for dismissal when the plaintiff does not have legal capacity to sue. 735 ILCS 5/2-619(a)(2) (West 2012). This court reviews *de novo* the trial court's ruling. *Kean*, 235 Ill. 2d at 361. When ruling on a section 2-619 motion to dismiss, the court must interpret the pleadings and supporting documents in the light most favorable to the nonmoving party. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367-68 (2003). On appeal, we "review the trial court's judgment, not its rationale," and we "can affirm for any reason the record supports." *People v. Reed*, 361 Ill. App. 3d 995, 1000 (2005).

¶ 41    Subject matter jurisdiction concerns the authority of the court to hear and determine cases of the general class to which the proceeding in question belongs. *Crossroads Ford Truck Sales, Inc. v. Sterling Truck Corp.*, 2011 IL 111611, ¶ 27. "Generally speaking, a justiciable matter is a controversy appropriate for review by the court, in that it is definite and concrete, as opposed to hypothetical or moot, touching upon the legal relations of parties having adverse legal interests." (Internal quotation marks omitted.) *In re Luis R.*, 239 Ill. 2d 295, 301 (2010). The gist of defendants' argument is that, because a special administrator had not been appointed when the action was filed, "Susan Mankowski, as Special Administrator" was a "fictional entity," much like "Porky Pig," and, because a fictional entity may not sue or be sued in Illinois, any action brought by or against such an entity is a legal nullity.

¶ 42    Section 2.1 of the Act provides:

    "In the event that the only asset of the deceased estate is a cause of action arising under this Act, and no petition for letters of office for his or her estate has been filed, the court, upon motion of any person who would be entitled to a recovery under this Act, and after such notice to the party's heirs or legatees as the court directs, and without opening of an estate, may appoint a special administrator for the deceased party for the purpose of prosecuting or defending the action." 740 ILCS 180/2.1 (West 2012).

¶ 43    Section 2.1 allows a "person" who would be entitled to a recovery under the Act to file a motion requesting the trial court to appoint a special administrator for the deceased party. The purpose of appointing a special administrator is to enable a prosecution or defense of a wrongful death action. The statute presupposes that an identifiable, real person exists to request an appointment. In the present case, plaintiff is that identifiable, real person and is not a fictional entity.

¶ 44    However, the law is settled that plaintiff could not file a wrongful death suit in her individual capacity. See *Rodgers v. Consolidated R.R. Corp.*, 136 Ill. App. 3d 191, 193 (1985) ("In Illinois, wrongful death suits must be brought by and in the name of the personal representative of the deceased. The personal representative possesses the sole right of action or control over the litigation."). Defendants argue that, because plaintiff had not yet been appointed as special administrator, her claims against defendants were nullities. The plain language of the statute requires that the motion to appoint must be made by "any person who would be entitled to a recovery under this Act." 740 ILCS 180/2.1 (West 2012). The record reflects that no probate estate had been opened; therefore, the only person who could have moved for the appointment was plaintiff, and she did.

¶ 45    The gravamen of defendants' argument pertaining to subject matter jurisdiction is focused on the timing of plaintiff's appointment as special administrator. Defendants argue

that "Susan Mankowski, as Special Administrator" did not exist as a legal entity when the lawsuit was filed and did not come into existence until she was appointed by the trial court after the two-year period of limitations and the four-year period of repose. In *Nagel*, 402 Ill. App. 3d 766, the reviewing court noted that the administrator should be appointed first and the wrongful death action filed subsequently. *Id.* at 770 (citing *Lindsey v. Special Administrator of the Estate of Phillips*, 219 Ill. App. 3d 372, 377 (1991)). However, the *Nagel* court also stated that a failure to follow this procedure was not necessarily fatal to a cause of action. *Id.*

¶ 46        The *Nagel* court cited *McMann v. Illinois Midland Coal Co.*, 149 Ill. App. 427 (1909), which is instructive as to whether the instant lawsuit is a nullity because plaintiff had not yet been appointed as special administrator. In *McMann*, the plaintiff brought a personal injury suit in his own name. While his lawsuit was pending, the plaintiff died, and then it was brought to the court's attention that the plaintiff was a minor and lacked the capacity to sue in his own name. *Id.* at 428. The administrator of the plaintiff's estate sought to be substituted as the plaintiff, and the defendant objected. The defendant was apparently unaware until then that the plaintiff was a minor. The trial court substituted the administrator as the plaintiff. *Id.* In the present case, defendants claim that they likewise did not know that plaintiff had not, in fact, been appointed as special administrator.

¶ 47        Defendants here make the same argument that the defendant made in *McMann*, that "it was questionable whether any suit was in existence" when the administrator sought to be substituted as the plaintiff due to the plaintiff's lack of capacity to sue in his own name. *Id.* The *McMann* court rejected this argument, explaining that the plaintiff's suit was "not subject to be abated or dismissed without leave to amend by substituting some person as next friend." *Id.* Once a proper party (the administrator) was substituted, "the suit was not thereafter liable to be abated or dismissed." *Id.* Here too, the result should be the same. Although plaintiff in her individual capacity could not maintain a wrongful death suit (see *Rodgers*, 136 Ill. App. 3d at 193), it was not subject to dismissal; the trial court's appointment of plaintiff as special administrator "cured" this procedural defect. See *McMann*, 149 Ill. App. at 428.

¶ 48        In support of their argument, defendants rely on *Bogseth v. Emanuel*, 166 Ill. 2d 507 (1995), *Santiago v. E.W. Bliss Co.*, 2012 IL 111792, and *Relf v. Shatayeva*, 2013 IL 114925, all of which can be distinguished. In *Bogseth*, the plaintiffs listed "John Doe" as a respondent in discovery to represent someone who they thought might exist and might be proven culpable; our supreme court held that a suit filed against a fictitious person, "John Doe," was a nullity. *Bogseth*, 166 Ill. 2d at 513-14. In *Santiago*, the plaintiff intentionally brought a suit under a fictitious name and later filed an amended complaint in his legal name. The supreme court allowed the suit to go forward, noting that the purpose of the relation-back provision of section 2-616(b) of the Code (735 ILCS 5/2-616(b) (West 2010)) was to preserve causes of action against loss due to technical pleading rules. *Santiago*, 2012 IL 111792, ¶ 25. In *Relf*, the plaintiff filed a personal injury suit against a driver who was deceased when the suit was filed. Later, the plaintiff's attorney requested that his legal assistant be appointed as "special administrator" for the deceased. The supreme court held that the decedent's son was the proper party to be appointed as administrator and that the plaintiff was required to substitute the son as the defendant to preserve her otherwise invalid cause of action. *Relf*, 2013 IL 114925, ¶ 60. In distinguishing the foregoing cases, we note initially that our supreme court

has treated differently the modification of a defendant's capacity and a plaintiff's capacity. See *Vaughn v. Speaker*, 126 Ill. 2d 150 (1988). In *Vaughn*, our supreme court considered whether, under section 2-616(d) of the Code, the second complaint naming the executors of the decedent's estate as the defendants related back, for purposes of the statute of limitations, to the initial complaint, which named the decedent as the defendant. *Id.* at 159-60. Before considering section 2-616(d), the *Vaughn* court explained that the second complaint was itself untimely, as it was filed after the limitations period for the action had expired, no statutory provision extended the limitations period, and the substitution of the executors was not the correction of a misnomer. *Id.* at 156-57. Furthermore, contrary to *Bogseth* and *Santiago*, plaintiff is a real person, and she sued in her real name; the trial court later merely allowed her to proceed in her capacity as special administrator. Contrary to *Relf*, the proper plaintiff filed suit against the proper defendants; thus, *Relf* is inapplicable.

¶ 49    Accordingly, because plaintiff is an identifiable, real person, and not a fictional entity, the trial court could appoint plaintiff as special administrator, the lawsuit was not a nullity, and the court had subject matter jurisdiction. The trial court properly denied defendants' section 2-619 motion to dismiss.

¶ 50    Defendants next take issue with the trial court's decision to appoint plaintiff as special administrator. Defendants argue that the appointment should not have related back to when the lawsuit was filed. In support of their argument, defendants argue that there is no basis for the relation-back doctrine because (1) the action was void as a nullity when the special administrator was appointed; (2) there was no valid plaintiff when the administrator was appointed; (3) no amended complaint was ever filed that could have related back; (4) when the special administrator was appointed, there was nothing to which anything could relate back, since everything before then was a nullity; and (5) the appointment of the special administrator came after the periods of limitations and repose.

¶ 51    We have already rejected defendants' first two arguments in our discussion of their motion to dismiss. We summarily reject defendants' third argument, as plaintiff was not required to file an amended complaint after her appointment as special administrator. See *Nagel*, 402 Ill. App. 3d at 772. Plaintiff's appointment cured the only defect, which was not even apparent on the face of the complaint. There was nothing to amend. We also reject defendants' fourth argument, since it is based entirely upon defendants' previously rejected argument that "everything before [the appointment] was a total nullity."

¶ 52    That leaves us with the propriety of the trial court's appointment of plaintiff as special administrator and, if it was proper, whether the appointment related back to the time of the original filing. Under the Act, the "action shall be brought by and in the names of the personal representatives of such deceased person, and, except as otherwise hereinafter provided, the amount recovered in every such action shall be for the exclusive benefit of the surviving spouse and next of kin of such deceased person." 740 ILCS 180/2 (West 2012). Plaintiff, as surviving spouse and administrator, is the only party by whom and in whose name this suit could be brought. She, in that capacity, is the sole plaintiff, and the only proper plaintiff, in this cause of action.

¶ 53    Defendants take issue not so much with plaintiff's being appointed as special administrator but, rather, with the propriety of the trial court's decision given the timeliness of the request. Walter died on April 7, 2009, and plaintiff's original complaint was filed on

March 25, 2011, clearly within the two-year limitations period. However, plaintiff did not file her request to be appointed as special administrator until September 10, 2013.

¶ 54    Our supreme court resolved this issue in *Boatmen's National Bank of Belleville v. Direct Lines, Inc.*, 167 Ill. 2d 88 (1995). In *Boatmen's*, the decedent, Lynn Tartt, died on November 22, 1986. On May 9, 1988, the decedent's father, as special administrator of the decedent's estate, filed a complaint under the Act. On October 26, 1988, the defendants moved to dismiss the third amended complaint after discovering that the decedent was married at the time of her death. *Id.* at 90-91. Finally, on December 19, 1991, the estate filed a ninth amended complaint that was brought solely on behalf of the decedent's husband. The cause eventually proceeded to trial, and the estate and the defendants appealed. *Id.* at 96-97. On appeal, the supreme court considered whether the ninth amended complaint, which was filed long after the limitations period had passed and was filed by an individual not named as a party in the original complaint, nevertheless related back to the timely filing of the original complaint. *Id.* at 100. In determining that the ninth amended complaint related back to the original complaint, the supreme court reviewed section 2-616 of the Code (Ill. Rev. Stat. 1985, ch. 110, ¶ 2-616(b) (now 735 ILCS 5/2-616(b) (West 2012))) and reasoned that the original complaint informed the defendants of the nature of the underlying cause of action and the basis upon which liability was predicated; that complaint put defendants on notice of the class of beneficiaries who could recover under the Act; the amendment did not change the nature of the suit; and the amended complaint grew out of the same transaction or occurrence set out in the original complaint.

¶ 55    Section 2-616 of the Code provides, in relevant part:

> "The cause of action *** set up in any amended pleading shall not be barred by lapse of time under any statute *** prescribing or limiting the time within which an action may be brought or right asserted, if the time prescribed or limited had not expired when the original pleading was filed, and if it shall appear from the original and amended pleadings that the cause of action asserted *** in the amended pleading grew out of the same transaction or occurrence set up in the original pleading, even though the original pleading was defective in that it failed to allege the performance of some act or the existence of some fact or some other matter which is a necessary condition precedent to the right of recovery ***, if the condition precedent has in fact been performed, and for the purpose of preserving the cause of action, *** set up in the amended pleading, and for that purpose only, an amendment to any pleading shall be held to relate back to the date of the filing of the original pleading so amended." 735 ILCS 5/2-616(b) (West 2012).

¶ 56    In the present case, based on our review of the record, section 2-616(b) of the Code, and the relevant case law, we reach a result similar to *Boatmen's*. Plaintiff's original complaint, filed on March 25, 2011, informed defendants of the nature of the underlying cause of action and the basis upon which liability was predicated (negligence); it put defendants on notice of the class of beneficiaries who could recover under the Act (plaintiff and her children); the amendment, *i.e.*, the appointment, did not change the nature of the suit; and the amended complaint grew out of the same transaction or occurrence set out in the original complaint. Accordingly, we conclude that the amended complaint, reflecting plaintiff's capacity as special administrator as ordered by the trial court, related back to the filing of the original complaint.

¶ 57　　　We turn next to defendants' alternative request for a new trial. Defendants challenge three of the trial court's rulings on the motions *in limine*; one ruling pertaining to the cross-examination of Quigg; and one ruling pertaining to a jury instruction. All of these rulings are reviewed for an abuse of discretion. See *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746, ¶ 126 (stating that a ruling upon a motion *in limine* rests in the sound discretion of the trial court and will not be reversed absent an abuse of discretion (citing *In re Leona W.*, 228 Ill. 2d 439, 460 (2008))); *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 106 (1995) (stating that the determination of the scope and extent of cross-examination of an expert witness rests in the sound discretion of the trial court and will not be reversed absent an abuse of discretion); *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273-74 (2002) (stating that a trial court has discretion to determine which instructions to give the jury and that determination will not be disturbed absent an abuse of that discretion).

¶ 58　　　With respect to all but the challenge to Quigg's cross-examination, we find no abuse of the trial court's discretion. With respect to the challenge to the cross-examination, we consider it forfeited for violating Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013). In providing citations to the record to elucidate Quigg's testimony, the objections, and the court's ruling, defendants set forth in a footnote that "[t]he transcript from the evidence deposition of Dr. Quigg reflecting the court's ruling on this issue is contained in Volume V of the record" and leave it to this court to identify the precise pages they rely upon. This is not helpful and violates Rule 341(h)(7), which requires "reference *** to the pages of the record *** where evidence may be found." Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013). Counsel is advised to provide more specific citations in the future.

¶ 59　　　Plaintiff's motions *in limine* 2 and 3 sought to bar the admission of the statement signed by Walter and David when Walter entered the Institute. As reflected above, the trial court conducted a hearing on the motions; conducted a hearing on defendants' motion to reconsider; and heard an offer of proof during trial. The trial court found that the statement signed by David would be relevant only if his breach-of-contract claim (former count III) remained pending. Because count III was dismissed, the statement was not relevant. Upon reconsideration, the trial court determined that the statement had no relevance if it was not asserted to be a release. The trial court further balanced the probative value of the statement and its prejudicial effect and determined that it was too prejudicial to be admitted. Defendants have not presented any meaningful reason for this court to find an abuse of the trial court's discretion. See *DiCosolo v. Janssen Pharmaceuticals, Inc.*, 2011 IL App (1st) 093562, ¶ 41 (stating that the party seeking reversal bears the burden of establishing prejudice and showing that the trial court's ruling materially affected the outcome of the trial).

¶ 60　　　Similarly, the trial court's rulings regarding defendants' motion *in limine* barring any claim or reference to fraud by the Institute were not abuses of its discretion. The trial court noted that defendants failed to object when the purported violations occurred, which would have allowed the trial court to rule on the objection and perhaps sustain it and strike the testimony. Despite that, the trial court heard arguments on defendants' motion for a mistrial and found that David's testimony did not imply any fraud. The trial court also found that, during closing argument, the tenor of plaintiff's argument was directed toward showing a purported breach of the standard of care and rebutting the defense that treatment was not

offered. We note that in his closing argument defense counsel used the same phrase that plaintiff's counsel had used, stating, "You heard, more importantly, that he operates under the guise of a spiritual leader." Our review of the proceedings leads us to conclude that no abuse of discretion occurred. See *McDonnell v. McPartlin*, 192 Ill. 2d 505, 534 (2000) (stating that a trial court is vested with broad discretion to determine the propriety of declaring a mistrial).

¶ 61 With respect to Thomas's testimony, we review the trial court's decision to admit expert opinion for an abuse of discretion. See *Van Gelderen v. Hokin*, 2011 IL App (1st) 093152, ¶ 36. Defendants raise the same objection they raised in the trial court, that is, the testimony was speculative and conjectural. The trial court heard defendants' argument and determined that Thomas's testimony was relevant. The trial court described her testimony as "a link in the chain in her opinion, [and] it's part of someone else's opinion." Defendants have provided this court with no reason to find an abuse of the trial court's discretion.

¶ 62 With respect to defendants' argument pertaining to jury instruction No. 16, the trial court had discretion to determine which instructions to give the jury, and that determination will not be disturbed absent an abuse of that discretion. *Schultz*, 201 Ill. 2d at 273-74. Illinois Supreme Court Rule 239(a) (eff. Jan. 1, 1999) requires that "[w]henever Illinois Pattern Jury Instructions (IPI), Civil, contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law." A trial court does not abuse its discretion regarding jury instructions if the instructions in their entirety "fairly, fully, and comprehensively apprise[ ] the jury of the relevant legal principles." *Schultz*, 201 Ill. 2d at 273-74. The trial court ruled that there were disparate opinions about what Walter's life expectancy could or might have been, so it gave the instruction over defendants' objection. Defendants acknowledge that the instruction was a standard IPI instruction but argue, without any supporting authority, that "it was inappropriate for and did not fit the facts or claims involved in this case." Without more, we find no abuse of the trial court's discretion.

¶ 63 Additionally, we note that there was no cumulative error. A new trial is necessary when the cumulative effect of trial errors so deprives a party of a fair trial that the verdict might have been affected. *Mueller v. Phar-Mor, Inc.*, 336 Ill. App. 3d 659, 670 (2000). As we find no error, we necessarily find no cumulative error. *People v. Phillips*, 392 Ill. App. 3d 243, 276 (2009).

¶ 64 The final issue is defendants' alternative request to reduce the damages award. Defendants argue that the award was grossly excessive. Defendants assert that "[i]t is reasonable to believe that the excessive verdict *** was the result of the jury's passions and prejudice." We reject defendants' request to reduce the damages award.

¶ 65 The Act creates a cause of action for the survivors of a decedent to recover damages from the party that negligently or wrongfully caused the decedent's death. 740 ILCS 180/1 (West 2012). The damages are limited to the survivors' "grief, sorrow, and mental suffering" that result from the decedent's death. 740 ILCS 180/2 (West 2012); *Smith v. Mercy Hospital & Medical Center*, 203 Ill. App. 3d 465, 481-82 (1990) (holding that the legislature clearly intended for survivors to be compensated for their loss resulting from the death of the decedent); *Cooper v. Chicago Transit Authority*, 153 Ill. App. 3d 511, 517-18 (1987) (holding that the Act allows for recovery of only pecuniary losses). The Illinois Appellate Court for

the Third District has held that adult children may recover pecuniary damages under the Act for the loss of a parent's "guidance, advice, love and affection." (Internal quotation marks omitted.) *In re Estate of Keeling*, 133 Ill. App. 3d 226, 228 (1985). This court has followed that holding and allows adult children to recover pecuniary losses for the death of parents. *Cooper*, 153 Ill. App. 3d at 518.

¶ 66     Defendants presented this very argument to the trial court at the hearing on their posttrial motion. In denying their motion, the trial court specifically commented that the verdict did not "shock[ ] the conscience." The trial court found that the verdict was not the effect of "passionate prejudice" and further stated that it had "the firm conviction that [the verdict] was within the evidence related to the value of the plaintiffs' remaining family life which was remarkable, and so it was within the discretion of the jury to make a fair and reasonable compensation." Defendants make no reasoned attempt to challenge the trial court's reasoning or decision, and we decline now to alter it.

¶ 67                                      III. CONCLUSION

¶ 68     For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 69     Affirmed.

¶ 70     JUSTICE ZENOFF, specially concurring.

¶ 71     I agree that plaintiff's complaint was valid despite the fact that she was appointed as special administrator only after the limitations period had expired. I write separately, though, because I would reach that holding differently.

¶ 72     In my view, the authority that best supports this result is *Pavlov v. Konwall*, 113 Ill. App. 3d 576 (1983). There, the decedent died on March 5, 1978, and the plaintiff filed his original complaint, purportedly as the special administrator of the decedent's estate, on March 3, 1980. *Id.* at 577. He was appointed as administrator the same day, but the appointment was invalid because it was not made on the motion of a person entitled to recover under the Act. *Id.* His complaint was dismissed, and an amended complaint was stricken. *Id.* He was not validly appointed until January 26, 1981, and thereafter he filed a second amended complaint. *Id.* The defendant moved to dismiss, arguing that the valid appointment "was beyond the two-year statute of limitations applicable to wrongful death actions, and therefore could not relate back to the original complaint since the lack of a proper party plaintiff made that filing a complete nullity." *Id.* The First District rejected that argument:

> "[W]e believe that in the instant case the second amended complaint relates back to the time of the filing of the original complaint. Both pleadings make substantially the same allegations and[ ] the cause of action asserted in the amended and original pleadings arose out of the same occurrence or transaction. In both pleadings the estate of decedent has been named as the interested party and it has been clear from the start that [the plaintiff] intended to bring the action as administrator of that estate. That [the plaintiff] was not properly named administrator on the motion of the decedent's heirs until after the limitations period had run is a technical consideration which, in light of section 46 [(the predecessor to section 2-616(b) of the Code)], should not

- 15 -

prevent the cause from being decided on its merits in furtherance of justice." *Id.* at 579.

¶ 73 The only distinction here is that, after her appointment, plaintiff did not file an amended complaint. However, the *Nagel* court held that requiring such an amended complaint "would elevate form over substance." *Nagel*, 402 Ill. App. 3d at 771. Indeed, the court noted that, in *Pavlov*, the second amended complaint was necessary only "because the court struck [the plaintiff's first amended] complaint before the plaintiff was properly appointed as the special administrator of the decedent's estate, leaving no complaint on file." *Id.* The court continued:

"Our cases make clear that the appointment of an administrator *itself* relates back to the time of the original pleading. See [citation]; *Pavlov*, 113 Ill. App. 3d at 577 *** (answering in the affirmative a certified question that asked whether the ' "proper appointment of an administrator" ' relates back to the time of the original complaint). Thus, the order appointing the plaintiff as the administrator of [the decedent's] estate related back to the time when he filed his original complaint. This cured the only defect in the complaint, without the need to amend anything on the face of the complaint. To require an amended complaint under these circumstances would be at odds with the policy embodied in the relation-back statute and in the many cases that have addressed the issue." (Emphasis in original.) *Id.* at 772.

¶ 74 Defendants assert that *Pavlov* was "questioned" by the supreme court in *Vaughn*. This, however, is simply untrue. Indeed, in *Vaughn*, the supreme court merely "express[ed] no opinion" on the holding in *Pavlov*. *Vaughn*, 126 Ill. 2d at 160. Thus, defendants' assertion strikes me as clearly inaccurate.

¶ 75 This court has previously approved of *Pavlov* (*Jablonski*, 287 Ill. App. 3d at 756), and defendants offer no compelling reason to depart from it. Thus, on this basis, I agree that plaintiff's complaint was valid.

¶ 76 JUSTICE McLAREN, specially concurring.

¶ 77 I specially concur because I believe that both of the foregoing analyses are valid *rationes decidendi*. I therefore concur in both opinions.