2022 IL App (2d) 210057
No. 2-21-0057
Opinion filed June 13, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| KATHERINE A. PALM, as Co-trustee of the Diane L. Sergi Trust, Dated March 4, 2001, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 16-L-389 |
| DANIEL A. SERGI, Individually, as Trustee of the Daniel A. Sergi Trust, Dated March 4, 2001, and as Former Trustee of the Diane L. Sergi Trust, Dated March 4, 2001, and GREATBANC TRUST COMPANY, as Trustee of the R.H. Wine & Co. Employee Stock Ownership Trust, | ) ) ) ) ) ) ) ) ) | |
| | ) ) | Honorable Angelo J. Kappas, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justice Jorgensen concurred in the judgment and opinion.
Justice McLaren specially concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    The plaintiff, Katherine A. Palm, the sister of the late Diane Sergi and an eventual co-successor trustee of the Diane L. Sergi Trust, sued the defendants, Daniel A. Sergi (Dan), Diane's husband, and GreatBanc Trust Company (GreatBanc), asserting claims relating to breach of fiduciary duty and breach of contract. After the parties filed cross-motions for summary judgment,

the trial court denied Palm's motion, granted the defendants' motions, and entered judgment in favor of the defendants. Palm now appeals. We reverse and remand.

¶ 2                                    I. BACKGROUND

¶ 3     The following facts are drawn from the parties' submissions and exhibits in support of their motions and, except where noted, are undisputed. Diane and Dan were married in 1982 and had two children, Justin and Janelle. Diane maintained the home and took care of the children, while Dan was the sole breadwinner.

¶ 4     In 2001, Diane and Dan created two trusts, the Diane L. Sergi Trust (Diane Trust) and the Daniel A. Sergi Trust (Dan Trust). Diane was the sole beneficiary of the Diane Trust, entitled to the income and any principal from the estate as she directed in writing. Under the original terms of the Diane Trust, the trust would serve as the vessel for all of Diane's assets when she died. If she predeceased Dan, Dan could receive certain distributions from the Diane Trust during his life and the remainder would pass to Justin and Janelle. The Dan Trust mirrored these terms.

¶ 5     Diane and Dan were co-trustees of both trusts. Article V of the trusts, "General Trust Provisions," granted the trustees the power to hold, sell, invest, and otherwise manage the trust property. Section 6 of that article in the Diane Trust stated, "Notwithstanding the foregoing, while I am living and not unable to manage my affairs," the settlor of the trust (Diane, in the case of the Diane Trust) had the sole power "to direct the retention or sale of any trust assets," but "my husband, as trustee, need not seek my approval to make any sale or investment."

¶ 6     Section 1 of article VI, "Trustee Provisions," stated:

> "Notwithstanding anything to the contrary herein, and unless specifically provided otherwise by me in writing, while my husband and I are acting as co-trustees, either my husband or myself, as co-trustee, may act unilaterally (*i.e.* without the participation of the

other co-trustee) for me and on my behalf under this trust agreement and I agree, on behalf of myself, my heirs, successors and assigns, to hold harmless any person or entity that relies in good faith upon any such unilateral acts or directions by a trustee pursuant to this paragraph."

¶ 7 The Dan Trust held, among other things, shares of his employer, R.H. Wine & Company (R.H. Wine). Near the end of 2004, the Dan Trust sold these shares to R.H. Wine's employee stock ownership plan (ESOP) in return for a note in the amount of $6.4 million (Note), issued to the Dan Trust. GreatBanc was the trustee, holder, and administrator of the ESOP.

¶ 8 In February 2005, through a series of assignments, a 20% interest in the Note was assigned to the Diane Trust. In March 2005, GreatBanc received a copy of the assignments, which identified Dan and Diane as co-trustees of both the Dan Trust and the Diane Trust. According to GreatBanc, this was the only information they ever received regarding the trusts; they never received copies of the trust agreements. GreatBanc also received a letter from Dan and Diane's lawyer, directing GreatBanc to split all future payments on the Note, with 80% going to the Dan Trust and 20% going to the Diane Trust. Beginning in April 2005, the monthly payments were split this way. In December 2005, the ESOP made a $2 million payment of principal, and the Diane Trust received $400,000 (20%) of that payment.

¶ 9 In 2007, Dan issued new wiring instructions to deposit each trust's share of the monthly payments in separate accounts at The Private Bank. He did this by instructing R.H. Wine's chief financial officer, Matthew Reed, to issue new deposit instructions to GreatBanc. Diane was copied on this e-mail. In their cross-motions and on appeal, the parties did not identify any evidence about whether Diane was a signatory on the account in which the Diane Trust's share of the monthly

payments was deposited, received statements from that account, or had any other access to the account.

¶ 10     In July 2008, Diane filed a petition to dissolve the marriage.

¶ 11     In April 2009, Dan redirected the monthly payments on the Note so that 100% of those payments were deposited into his personal bank account, including the 20% that formerly went to the Diane Trust account. He did this by instructing Reed to issue new deposit instructions to GreatBanc. Diane was not copied on any of these e-mails. GreatBanc then began depositing all of the monthly payments in Dan's personal account.

¶ 12     In his second amended affirmative defenses, Dan stated that he redirected these funds while acting as co-trustee of the Dan Trust. The record suggests that no one acting on behalf of the Diane Trust was involved in rerouting the Diane Trust's share of the monthly payments on the Note into Dan's personal account. Reed testified in deposition that he never spoke to Diane and did not know that the Diane Trust existed.[1] Although GreatBanc knew that the Diane Trust held a 20% interest in the Note, it did not require any authorization from the Diane Trust before redirecting that portion of the monthly payments into Dan's personal account.

¶ 13     Dan testified generally that he continued to support Diane while the divorce was pending, paying for family expenses. The record does not contain any documentation of such expenditures from Dan's personal account that received the monthly payments on the Note between April 2009

---

[1]Reed's testimony contradicts Dan's assertion that it is "undisputed" that Reed communicated with GreatBanc in connection with Dan's role as co-trustee of the Diane Trust. If, in fact, Dan was acting on behalf of the Diane Trust in issuing instructions to Reed, the record indicates that he did not tell Reed that (or, through Reed, GreatBanc).

and April 2011, or otherwise document how the Diane Trust's 20% share of the monthly payments was spent or retained after April 2009.

¶ 14    In October 2010, Diane was diagnosed with stage 4 breast cancer.

¶ 15    In late fall 2010, Dan decided to buy out the retail insurance brokerage business of his employer, and, in December 2010, he presented his employer with a formal letter of intent with the terms for the purchase of the business under the name Wine Sergi & Co., LLC (Wine Sergi). Under those terms, Wine Sergi would purchase the business for $2.55 million, a sum that included the tender of the Note, which had a total unpaid principal balance of about $1.6 million. The closing date was scheduled for April 30, 2011.

¶ 16    Dan asked Diane to contribute her trust's 20% share of the Note as part of the transaction. The record contains multiple e-mails between Dan and Diane, and between Diane and Justin, discussing this request. The e-mails reflect that both parties viewed the Diane Trust as having an interest in the Note separate from the Dan Trust and assumed that Diane's consent was needed before that interest could be used for the deal. The e-mails also reflect that Diane wavered on and resisted Dan's request, telling Dan as late as April 24, 2011, that she did not agree to use the Diane Trust's interest in the Note to fund the new company. Dan pressured her, saying it was necessary to the deal and would benefit her and the children, who would then have an interest in a more profitable company. Between December 2010 and April 24, 2011, Dan repeatedly promised that the stock of the new company would be placed in a family trust, of which the children would be the sole beneficiaries.

¶ 17    During this same period, Diane privately expressed concern to Justin and Palm about losing her financial support from Dan, including her health insurance coverage. Dan averred that, in January 2011, he and Diane reached an oral agreement under which they would remain married

and Diane would remain covered under Dan's insurance, he would pay her credit card bills and $5000 per month for other expenses, and he would provide a home and car for her use. Diane voluntarily dismissed the divorce proceeding in March 2011.

¶ 18   On April 22, 2011, The Private Bank, which held the accounts for the Dan and Diane Trusts as well as Dan's personal account to which he had redirected the monthly payments, sent Dan an e-mail (copying Diane) that read:

"Per your request, below I have outlined the terms of the investment agency agreement and the terms of your trust agreement.

The PrivateBank [*sic*] is acting as investment agent to the Daniel A. Sergi and Diane L. Sergi, Co-Trustees, Daniel A. Sergi Trust dated 3/4/01, Diane A. Sergi Trust dated 3/4/01, Tenants in Common. Given the account is titled in both of your trusts and as Tenants in Common, either co-trustee may act alone on behalf of both trusts. Therefore, either Co-Trustee may give me directions to withdrawal [*sic*] any amount from the investment agency account. I'm faxing an email we received from the attorney who drafted your trust agreements supporting this position you both have over the investment agency account.

***

Also, please note in each of your respective trust agreements under Article I, paragraph 1, Income and Principal it states 'During my lifetime the trustee shall pay the income from the trust estate in convenient installments to me or otherwise as I may from time to time direct in writing, and also such sums from principal as I may request at any time in writing.' What this says, since you both are co-trustees, either party can withdraw funds for any amount."

Diane forwarded the e-mail to Justin, saying that she was "[n]ot sure what this is about."

¶ 19    On April 25, 2011, Diane sent Dan an e-mail that included the following statement: "For no other reason than I have always supported and encouraged you in all your business endeavors I will sign the note." In an e-mail sent three days later, Diane voiced doubts and unhappiness about transferring her portion of the Note but again said she would "sign the papers." Ultimately, however, Diane signed only the documents prepared by Dan's lawyers, which did not mention the Diane Trust's interest in the Note and instead transferred only the interest held by the Dan Trust. It is undisputed that Diane signed those documents only in her capacity as co-trustee of the Dan Trust, and that the use of the Diane Trust's interest in the Note to fund Dan's purchase of Wine Sergi was never authorized in writing by anyone purporting to act on behalf of the Diane Trust. Nevertheless, on April 30, 2011, GreatBanc applied the entire balance of the Note to the purchase transaction, extinguishing all of the interest held by the Dan Trust and the Diane Trust. The Diane Trust did not receive any compensation for the release or termination of its interest in the Note, either on April 30, 2011, or later.

¶ 20    Dan was removed as a co-trustee of the Diane Trust through an amendment to the trust on August 30, 2012. Diane died on October 2, 2012. Justin succeeded her as trustee of the Diane Trust.

¶ 21    Dan became the sole owner of the newly formed company Wine Sergi. Although Dan had promised to place the ownership of Wine Sergi in a trust for the benefit of Justin and Janelle, he did not do so. Dan remarried. In 2014, Dan sold Wine Sergi. None of the proceeds from the sale of Wine Sergi were paid to the Diane Trust. When asked in deposition whether he could identify any benefit that the Diane Trust received from the use of its interest in the Note, Dan said no. Instead, he asserted that he provided substantial support to the trust's beneficiaries.

¶ 22    On April 29, 2016, Palm, identified as an "agent" of the Diane Trust, filed suit against Dan and GreatBanc. At the time she filed suit, she was not a trustee of the Diane Trust. Count I of the complaint alleged that GreatBanc breached the terms of the Note by releasing the Diane Trust's interest in the Note without authorization. Counts II through V were directed against Dan individually and as a trustee for the Dan Trust, and asserted claims of breach of fiduciary duty, unjust enrichment, and constructive trust, and for an accounting.

¶ 23    Dan moved to dismiss for lack of standing, arguing that Palm could not sue as an agent for the Diane Trust because, under the Trusts and Trustees Act (760 ILCS 5/1 *et seq.* (West 2014) (repealed eff. Jan. 1, 2020)), only trustees had the power to sue on behalf of trusts. In August 2016, Palm was appointed as a co-successor trustee of the Diane Trust. In that capacity, she sought and was granted leave to file an amended complaint asserting the same claims but identifying herself as co-trustee of the Diane Trust and Dan as a former trustee of that trust. The trial court thereafter denied Dan's motion to dismiss, finding that Palm had standing to sue and that the amended complaint was timely because it related back to the date on which the original complaint was filed.

¶ 24    The parties conducted discovery and filed cross-motions for summary judgment. Palm moved for summary judgment on the basis that Diane signed the assignment of the Dan Trust's interest in the Note only in her capacity as co-trustee of the Dan Trust, and thus the use of the Diane Trust's interest in the Note was indisputably unauthorized. Further, that use was improper because Dan used that interest to benefit himself to the detriment of the Diane Trust. Dan moved for summary judgment on several bases, arguing that (1) Palm lacked standing because only beneficiaries, not successor trustees, could assert claims against trustees, (2) the Diane Trust allowed him to act unilaterally with respect to its assets, and thus he could not have breached his fiduciary duty toward the trust, and (3) Diane consented to the use of the Diane Trust's interest in

the Note. Finally, GreatBanc's motion argued that it merely followed Dan's instructions about where to direct the payments on the Note and Dan was authorized to issue those instructions unilaterally under the terms of the Diane Trust. The trial court denied Palm's motion and granted summary judgment to Dan, agreeing with his argument that Palm lacked standing because only trust beneficiaries could bring equitable claims against a former trustee. The trial court also construed the terms of the Diane Trust as permitting Dan to act unilaterally and permitting GreatBanc and other third parties to rely on Dan's unilateral actions, and it therefore granted GreatBanc's motion for summary judgment as well.

¶ 25    Finally, the trial court held that any claims arising from the 2009 diversion of the monthly payments on the Diane Trust's 20% interest in the Note were time-barred. Palm had argued that none of the trustees of the Diane Trust (Diane and then Justin) knew of the diversion until after Diane's death and thus, under the discovery rule, the diversion claims were timely. The trial court found that Diane knew or reasonably should have known about the diversion earlier because it was "unrebutted" that Diane "was getting statements from the bank account associated with the Diane Trust from 2010 to 2012" and should have noticed that the monthly payment was no longer being paid into that account.[2]

---

[2]It is unclear where in the record the trial court found evidence that Diane received such statements. Dan's statement of undisputed facts did not assert that Diane received such statements. Palm testified in deposition that Diane was capable of reading and understanding financial records throughout that period, but she never testified that Diane in fact received statements from the Diane Trust account. Dan and GreatBanc submitted one e-mail from 2007 (two years earlier than the diversion), on which Diane was copied, that provided separate routing instructions for the Dan

¶ 26    This appeal followed.

¶ 27                                    II. ANALYSIS

¶ 28    On appeal, Palm contends that the trial court erred in granting summary judgment in favor of the defendants, because it misapprehended the applicable law regarding standing, it misconstrued the authority to act unilaterally granted by the trusts, and at a minimum there were genuine disputes of material fact regarding whether the claims relating to the 2009 diversion of payments were timely. A motion for summary judgment is properly granted where the pleadings, depositions, admissions, and affidavits establish that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005 (West 2016); *Gaylor v. Village of Ringwood*, 363 Ill. App. 3d 543, 546 (2006). "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). Plaintiffs need only present evidence sufficient to show a genuine dispute about a factual issue; they "are not required to prove their case at the summary judgment stage." *Thompson v. Gordon*, 241 Ill. 2d 428, 438 (2011). A triable issue precluding summary judgment exists where material facts are disputed or where the material facts are undisputed but reasonable persons might draw different inferences from the undisputed facts.

---

Trust's 80% share and the Diane Trust's 20% share of the monthly payments. However, there was no evidence that, during or after 2009, Diane received any statements for the Diane Trust account. And, although Dan acknowledged that he directed the 2009 diversion of the Diane Trust's 20% share of the monthly payments into his own account and averred that "Diane did not object," he did not provide any evidence that she actually knew or should have known of the diversion.

*Adams*, 211 Ill. 2d at 43. "Summary judgment should be granted only when the right of the moving party is clear and free from doubt." *Thompson*, 241 Ill. 2d at 438.

¶ 29    When the parties have filed cross-motions for summary judgment, they believe that the matter presents to the court no genuine issues of material fact, only questions of law. *Gaylor*, 363 Ill. App. 3d at 546. However, the fact that the parties filed cross-motions for summary judgment does not establish the absence of factual issues sufficient to preclude summary judgment; both the trial court and the reviewing court may independently determine that a genuine issue of material fact exists despite the parties' belief that no factual issue exists. *Id.* at 547. We review *de novo* the trial court's determination on cross-motions for summary judgment. *Id.* With these standards in mind, we turn to the issues.

¶ 30                             A. Standing to Sue

¶ 31    Dan's motion for summary judgment argued that Palm lacked standing to sue because (1) when she first filed suit, she was merely an agent of the Diane Trust, not a trustee; (2) even after her later appointment as a co-trustee, she lacked standing because only beneficiaries of trusts may sue trustees; and (3) even if co-trustees are proper plaintiffs in this action, the terms of the Diane Trust required both co-trustees (Justin and Palm) to join the suit as plaintiffs. In support of the second argument, Dan cited *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605 (2007), the case on which the trial court relied in finding that Palm lacked standing. Palm counters that she had standing because Justin, as successor trustee of the Diane Trust, appointed her as an agent of that trust with the power to file the suit on behalf of the trust, and Justin later supported her becoming a co-successor trustee. She also argues that *Fuller Family* does not apply here, as Dan is a former trustee rather than a current one.

¶ 32     Dan's first argument—that a trust cannot sue through a designated agent, even if that agent was authorized by the trustee—is the same argument he raised in seeking to dismiss both the original complaint and the amended complaint. The trial court rejected this argument, finding that the real party in interest at all times was the Diane Trust, which was alleged to have appointed Palm as an agent for the purpose of bringing suit. Dan renewed this legal argument in his motion for summary judgment, but the trial court did not rule on it, granting summary judgment on a different ground instead. On appeal, Dan again argues that a trust cannot bring suit through an agent who is not a trustee or beneficiary of the trust and thus, when the suit was first filed, Palm lacked standing to bring suit on behalf of the Diane Trust. Although the trial court did not rely on this argument in granting summary judgment, Dan argues that we should consider it, as we may uphold a trial court's judgment on any ground supported by the record. *Ultsch v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169, 192 (2007).

¶ 33     In support of his argument, Dan cites a case holding that, to have standing, a plaintiff must have some real interest in the cause of action, such as a legal or equitable interest in the subject matter of the action. *Weihl v. Dixon*, 56 Ill. App. 3d 251, 253-54 (1977). However, for the purposes of summary judgment, it is undisputed that, when she filed suit, Palm was acting on behalf of the Diane Trust, which had a legal interest in the subject of the suit, and that she was authorized to file suit by Justin, who also had legal title to that trust's property by virtue of being the sole successor trustee. Dan has not presented any evidence that Palm was not in fact authorized to file suit on behalf of the Diane Trust. Dan also cites authorities stating that trustees and sometimes beneficiaries may sue on behalf of a trust. He does not, however, cite any authority stating that an agent cannot act on behalf of a trustee to file a suit.

¶ 34    We concede that it is strange to see an agent, rather than a trustee, file suit on behalf of a trust. We have not discovered any case law explicitly either condoning or condemning this practice, although section 4.09 of the former Trusts and Trustees Act (760 ILCS 5/4.09 (West 2016) (repealed eff. Jan. 1, 2020)), which was in effect at the time this action was filed, expressly granted trustees the power to "appoint attorneys, auditors, financial advisers and other agents" to assist them. Importantly, however, in this case the trial court found that, at all times, the real party in interest was the Diane Trust. Dan has not argued that this finding was incorrect. Palm alleged that her standing to bring suit flowed solely from her appointment first as an agent and then as a co-successor trustee of the Diane Trust, and she has asserted no personal claims of her own in this action, only claims on behalf of that trust. As the Diane Trust was the real plaintiff when the suit was filed and remained the real party in interest after the complaint was amended, the fact that Palm acted on its behalf as a designated agent before being appointed as a co-successor trustee does not persuade us to accept Dan's argument.

¶ 35    Dan also argues that, even if Palm had standing to sue once she became a co-successor trustee, the amended complaint asserting her new role could not "relate back" to the filing of the original complaint and thus the suit was untimely. Contending that she lacked standing when the suit was first filed, he argues that the suit was a nullity from the start. We reject this argument as contradicted by the relevant legal authority.

¶ 36    In *In re Estate of Kleine*, 2015 IL App (2d) 150063, this court considered a similar argument. There, a surviving spouse, Jim Kleine, filed suit against the nursing home where his wife died. At the time he filed suit, someone else—Richard Calkins—was the special administrator of the estate of Kleine's deceased wife, but Calkins was not named as a plaintiff in Kleine's suit. *Id.* ¶¶ 2-4. At his request, Kleine was appointed as an additional special administrator of the estate

and obtained leave to file an amended complaint alleging that he represented the estate. Calkins still was not named as a plaintiff in the amended complaint. *Id.* ¶ 5. The defendants moved to dismiss on the basis that Kleine's appointment as a special administrator was void because Calkins had already been appointed. The trial court granted the motion, but gave Calkins time to file a second amended complaint. *Id.* ¶ 6. Calkins, as plaintiff, filed that pleading, but by then the statute of limitations on the claims had run. The defendants again sought dismissal, arguing that the second amended complaint could not relate back to the original complaint's filing date, and thus it was untimely. *Id.* ¶ 7. The trial court denied their motion but certified the question of whether the relation-back doctrine applied when the original complaint was filed by an improper representative and no proper plaintiff was substituted until after the limitations period had expired.

¶ 37　In considering that question, we reviewed several relevant cases, including *In re Estate of Mankowski*, 2014 IL App (2d) 140154, ¶ 47, in which this court held that, although the plaintiff lacked standing to bring suit on behalf of the estate when the suit was filed, her later appointment as special administrator "cured" the procedural defect, and the estate's claims should be allowed to proceed, and *Pavlov v. Konwall*, 113 Ill. App. 3d 576, 578-79 (1983), which held that the relation-back doctrine applied where an improperly appointed administrator was not properly appointed until after the limitations period had run. We also noted that section 2-616(a) of the Code of Civil Procedure (Code), which permits amendments "introducing any party who ought to have been joined as plaintiff" at any time before the entry of judgment (735 ILCS 5/2-616(a) (West 2012)), was a companion to section 2-616(b), which allows amended pleadings to relate back to an original timely filing date if the claims grew out of the same transaction or occurrence (*id.* § 2-616(b)). *Kleine*, 2015 IL App (2d) 150063, ¶ 35. We concluded that, where the original complaint was timely filed by a plaintiff who lacked proper capacity at the time of filing, but the amended

complaint substituted a plaintiff with the proper representative capacity and filed an amended complaint that asserted claims arising from the same facts, the amended complaint related back to the original filing date. *Id.* ¶ 33.

¶ 38    *Kleine* is directly on point with the facts in this case. Indeed, *Kleine* is a more difficult case, because there, the person who initially filed suit was not the same person who, as a proper representative, filed the amended complaint. Here, that person is the same, and even if Palm lacked the capacity to represent the Diane Trust when she first filed suit, she acquired that capacity before filing the amended complaint. Thus, under *Kleine*, the amended complaint relates back to the original filing date and is timely.

¶ 39    We also find support in *Bristow v. Westmore Builders, Inc.*, 266 Ill. App. 3d 257 (1994), in which this court considered a similar argument in a different context. A painting contractor who had not been paid for his work filed suit to enforce his mechanic's liens, listing the plaintiff as a corporation, "Manning Bristow Painting and Decorating, Inc." *Id.* at 259. The defendants moved to dismiss, asserting that the named plaintiff was a nonexistent legal entity. The contractor then successfully requested leave to amend his complaint to substitute "Manning Bristow d/b/a Manning Bristow Painting and Decorating," a sole proprietorship, as plaintiff. *Id.* After judgment was entered against the defendants, they appealed, arguing in part that, because the named plaintiff in the original complaint did not exist, the suit was a nullity and the later filing of an amended complaint naming a proper plaintiff was of no legal effect. *Id.* at 259-60.

¶ 40    We rejected this argument, holding that, although the plaintiff's error in the original complaint had raised a question about whether it was a proper plaintiff, the issue was essentially one of misnomer, a mistake in the name or description of a party. *Id.* at 261-62. Under section 2-401(b) of the Code (735 ILCS 5/2-401(b) (West 2016)), misnomer is not a basis for dismissing

a complaint. We noted that it was "abundantly apparent from the record that the parties were fully aware of the identities of the actual litigants and that an actual plaintiff was in existence." *Bristow*, 266 Ill. App. 3d at 262. Because "there were facts in the record which identified an entity capable of suing," and the error in styling the plaintiff as a (nonexistent) corporation rather than the correct sole proprietorship "resulted in no actual prejudice" to the defendants (*id.*), we held that the trial court did not err in permitting the plaintiff to amend the complaint to cure the defect. This result was consistent with section 1-106 of the Code (735 ILCS 5/1-106 (West 2016)), which directs that the Code should be liberally construed to promote a speedy final determination on the merits of the parties' claims. *Bristow*, 266 Ill. App. 3d at 262.

¶ 41    Facts similar to those that guided our decision in *Bristow* are present here. The record confirms that the parties have always known and acted as if the Diane Trust was the real party on whose behalf the suit was brought, the trust was always a legal entity that could sue to enforce its interests, and Palm was asserting only that trust's interests rather than any personal interest of her own, regardless of whether she was doing so as an agent or a co-trustee of the trust. Thus, the suit was not a nullity when it was filed, and the trial court did not err in permitting Palm to file an amended complaint in her capacity as a co-successor trustee. *Id.* And because the amended complaint asserted the same claims as the timely original complaint, it related back to the filing date of the original complaint. *Kleine*, 2015 IL App (2d) 150063, ¶ 35.

¶ 42    Citing *Fuller Family*, 371 Ill. App. 3d at 615, Dan next argues that Palm lacked standing to sue even after she was appointed a co-successor trustee, because only beneficiaries of trusts may sue trustees. Palm argues that *Fuller Family*'s holding—that beneficiaries are the proper persons to bring suit—applies only when the suit is directed at a current trustee of the trust. Here, however,

Dan is a former trustee and thus is a "third person" who can be sued by the Diane Trust's current trustees. Palm is correct.

¶ 43    It is well settled that a trustee is a proper person to bring suit against a third person on behalf of the trust and its beneficiaries. See 760 ILCS 3/816(24) (West 2020) (trustees may "prosecute or defend an action, claim, or judicial proceeding in any jurisdiction to protect trust property"); 760 ILCS 5/4.11 (West 2016) (repealed eff. Jan. 1, 2020; predecessor statute to 760 ILCS 3/816(24) (West 2020)) (same); *Ready v. Ready*, 33 Ill. App. 2d 145, 152 (1961) ("The right to sue in the ordinary case vests only in the trustee."); see also Restatement (Second) of Trusts § 282 (1959). Dan's sole support for his contention that the suit should have been filed by the beneficiaries of the Diane Trust rather than Palm (a co-successor trustee) is *Fuller Family*, 371 Ill. App. 3d at 615, in which the court stated that "it is the trust beneficiary who has the right to bring an action for damages based on a breach of fiduciary duty by *the trustee*." (Emphasis added.) But *Fuller Family* is inapplicable to the facts in this case, where neither Dan nor GreatBanc was a trustee of the Diane Trust when the suit was filed. Rather, Dan was a *former* trustee and thus was a stranger to the trust who could be sued by a trustee in the same way as any other third person. See *Grove v. Morton Community Bank*, 2022 IL App (3d) 210177, ¶ 29 (co-successor trustee of trust had standing to bring breach of fiduciary duty claim against former trustee); *Axelrod v. Giambalvo*, 129 Ill. App. 3d 512, 519 (1984) (former trustees who no longer held that office "stood as *** third persons in their relationship to the Trust"). Dan's argument that this action should have been brought by the beneficiaries of the Diane Trust is meritless.

¶ 44    Lastly, Dan argues that Palm cannot maintain this suit despite being a co-successor trustee, because Justin, the other co-successor trustee, did not join the suit. He points to section 12.04 of the Diane Trust, which states:

"In all matters pertaining to the administration of any trust, unless otherwise expressly provided by the terms of this agreement, when more than two Trustees are serving, the concurrence and joinder of a majority of the Trustees is required. If only two Trustees are serving, the joinder of both of them is required."

We first note that Dan's argument misapprehends the meaning of the term "joinder" as used here, where it expressly applies to "all matters pertaining to the administration of any trust." Because the trust uses "joinder" as a requirement for a wide array of nonlegal matters, it cannot refer only to the formal joining of a lawsuit. This is confirmed by the delegation powers in section 12.05—the very next provision of the Diane Trust—under which a trustee may approve a co-trustee's suit without formally joining it:

"Any Trustee may, by an instrument in writing, delegate to any other Trustee the right to exercise any power granted the Trustee in this agreement. During the time a delegation under this Section is in effect, the Trustee to whom the delegation was made may exercise the power *to the same extent as if the delegating Trustee had personally joined in the exercise of the power*." (Emphasis added.)

¶ 45    Thus, under the terms of the trust (which, as Dan acknowledges, control here), Justin was empowered to delegate to Palm his power to maintain suit on behalf of the Diane Trust, and that delegation enables Palm to maintain such a suit to the same extent as if Justin had personally joined in the suit. Dan asks us to treat this provision as ineffectual, but that would be improper. *Schroeder v. Sullivan*, 2018 IL App (1st) 163210, ¶ 27 (a trust should be construed "so that no language is treated as surplusage or rendered void or insignificant"). Moreover, the delegation that occurred here itself demonstrates that the requirements of section 12.04 were met, as Justin and Palm both agreed that the suit should be brought; if they did not, Justin would not have delegated to Palm the

power to prosecute the suit. Dan argues that, in *Stuart v. Continental Illinois National Bank & Trust Co.*, 68 Ill. 2d 502, 523 (1977), the supreme court held that "a co-trustee cannot exercise a joint power individually," but he neglects to mention the first half of that sentence: "[i]t is axiomatic that the limits of a trustee's powers are determined by the instrument which creates the trust." Here, the terms of the Diane Trust plainly permitted Justin to delegate to Palm the power to bring and maintain this suit.

¶ 46    We conclude that none of Dan's arguments regarding Palm's ability to bring this suit or the relation back of the amended complaint have merit, and that the trial court erred in granting summary judgment on that basis. However, Palm's purported lack of standing was not the only basis for the trial court's grant of summary judgment for the defendants. We turn to the next issue, whether the terms of the Diane Trust granted Dan the right to act unilaterally in the manner he did. We also consider whether the unilateral-action provision of the Diane Trust exonerates GreatBanc from liability.

¶ 47                              B. Power to Act Unilaterally

¶ 48    In 2011, the terms of the Diane Trust included the following provisions in article V, "General Trust Provisions":

>        "6. *Retained Powers*. Notwithstanding the foregoing, while I am living and not
>     unable to manage my affairs:
>
>            (a) *Power to Direct*. I shall have the power to direct the retention or sale of
>        my trust assets and the purchase of property with any principal cash in the trust.
>
>            (b) *Investment Approval*. No sale or investment shall be made without my
>        written approval, *** provided that my husband, as trustee, need not seek my
>        approval to make any sale or investment."

Article VI, "Trustee Provisions," included the following:

> "1. *Unilateral Acts of Trustee*. Notwithstanding anything to the contrary herein, and unless specifically provided otherwise by me in writing, while my husband and I are acting as co-trustees, either my husband or myself, as co-trustee, may act unilaterally (*i.e.* without the participation of the other co-trustee) for me and on my behalf under this trust agreement and I agree, on behalf of myself, my heirs, successors and assigns, to hold harmless any person or entity that relies in good faith upon any such unilateral acts or directions by a trustee pursuant to this paragraph."

Dan argues that these provisions gave him the right to act unilaterally with respect to the assets of the Diane Trust, allowing both the 2009 diversion of that trust's share of the monthly payments on the Note and the 2011 use of the trust's interest in the balance of the Note.

¶ 49 Palm counters with three arguments. First, she argues that Dan could act unilaterally, but only to exercise those powers authorized under the trust agreement. Noting that the Diane Trust received nothing in exchange for either Dan's diversion of the payments on the Note or his use of the balance, she asserts that the actions were unauthorized because the transfers of trust property were essentially gifts to Dan, and the terms of the Diane Trust did not grant trustees the power to make any gifts of trust property. Second, she contends that Dan's actions benefitted only himself, and thus were a breach of fiduciary duty even if he had been authorized to make gifts of trust property to others. Third, she notes that, even if Dan had been authorized to act alone on behalf of the Diane Trust, there is no evidence that he was in fact acting on behalf of the Diane Trust (rather than himself or the Dan Trust) when he diverted the payments in 2009 or used the balance of the Note in 2011. We examine each argument in turn.

¶ 50    It is well established that trustees must administer trust property in accordance with the terms of the trust instrument. *Id.*; *In re Estate of Adames*, 2020 IL App (1st) 190573, ¶ 59 ("Generally, 'the powers and duties of a trustee must be determined by the instrument creating the trust, and, by accepting the trust, the trustee becomes bound to administer it, or execute it, in accordance with the provisions of the trust instrument' " (quoting *In re Trusteeship Under the Last Will & Testament of Hartzell*, 43 Ill. App. 2d 118, 134 (1963))). Dan does not argue that the terms of the Diane Trust gave him the power to make a gift of trust property to anyone. Instead, he argues that his transfers of trust property in 2009 and 2011 should not be viewed as gifts because, although the trust itself received no direct compensation in return, the transfers increased the money that was available for him to use to benefit the family and thus were in the nature of investments.

¶ 51    The question of how the proceeds from Dan's 2009 and 2011 uses of the Diane Trust's property were spent is a factual question, and it is not resolved by the record, which contains no tracing of those proceeds, only Dan's general statements that he used his assets to support the family. However, Dan also testified that the Diane Trust received no benefit from his diversion and use of the trust assets, evidence that supports the argument that Dan essentially gave away trust property without authorization to do so under the terms of the trust. At the very least, it is clear that there is a substantial factual dispute on this issue that makes summary judgment inappropriate.

¶ 52    We next consider whether, even if the Diane Trust terms permitted trustees to make gifts, Dan's diversion and use of the trust's assets to benefit himself was permitted. "[A] trustee owes a fiduciary duty to serve the interest of the beneficiaries with total loyalty, excluding all self-interest, and is prohibited from dealing with the trust's property for [his or] her individual benefit." *Giagnorio v. Emmett C. Torkelson Trust*, 292 Ill. App. 3d 318, 325 (1997). This duty is paramount

and takes precedence over the terms of a trust. See 760 ILCS 3/105(b)(2) (West 2020) (the duty of a trustee to act in good faith prevails over the terms of a trust).

¶ 53    Dan offers no real argument on this point. Again characterizing his actions as investments rather than gifts to himself, he argues that trustees are held only to a reasonable-person standard of prudence and their investment decisions should not be overturned unless there are allegations of bad faith, fraud, or abuse of discretion. See *Continental Illinois National Bank & Trust Co. v. Sever*, 393 Ill. 81, 93 (1946). But of course, here there *are* allegations that Dan engaged in bad faith and self-dealing to the detriment of the Diane Trust, whose assets Dan was charged with preserving. Thus, Dan's argument is unavailing.

¶ 54    Palm's third argument is that, even if the terms of the trust had authorized Dan to give away the trust's assets, and even if diverting and using those assets as he did were not a breach of Dan's fiduciary duty of loyalty, the transfers of the trust's assets were legally ineffective, because at no point did anyone purporting to act on behalf of the Diane Trust—including Dan—authorize those transfers. The record supports this argument. In pleading his affirmative defenses, Dan stated that he redirected the monthly payments in 2009 while acting as co-trustee of the *Dan Trust*, not the Diane Trust. There is no evidence that Dan was acting on behalf of the *Diane Trust* in directing the diversion of the monthly payments of 20% away from the Diane Trust account and into Dan's personal account.

¶ 55    As for the 2011 application of the Diane Trust's interest in the balance of the Note toward Dan's purchase of Wine Sergi, there is no evidence that either Diane or Dan acted on behalf of the Diane Trust to authorize that use of trust assets. In other words, even if Dan or Diane was capable of acting alone on behalf of the Diane Trust to convey its interest in the Note, there is no record that either of them actually did so (or even purported to do so). The assignment that Diane

eventually signed was executed only in her capacity as a co-trustee of the *Dan Trust*, not the Diane Trust, and it expressly authorized only the use of the *Dan Trust*'s interest in the Note. Dan directed Reed to instruct GreatBanc to apply the entire balance due under the Note to the deal, but there is no record that Dan ever told anyone that he was acting on behalf of the Diane Trust when he did so. Indeed, Reed testified that he did not know of the Diane Trust's existence, let alone its interest in the Note. Thus, Reed cannot have conveyed to GreatBanc any authorization by the Diane Trust to release its interest in the Note. The record simply does not support the conclusion that Diane, Dan, or anyone else acting on behalf of the Diane Trust ever authorized the use of that trust's assets to fund Dan's purchase of Wine Sergi.

¶ 56    Like Dan, GreatBanc also asserts that the Diane Trust's unilateral-action provision absolves it of liability. We reject this argument for the same reasons already discussed, in particular the last one: no one acting on behalf of the Diane Trust authorized either the 2009 diversion of the Diane Trust's share of the monthly payments on the Note or the 2011 release of the Diane Trust's interest in the Note. GreatBanc stresses that it never dealt directly with Diane regarding the Note and that it was accustomed to dealing instead with Dan and Diane's agents, such as the attorney who informed GreatBanc about the assignment to the Diane Trust of a 20% interest in the Note, and Reed, who relayed instructions regarding the Note from Dan. This is not a defense, however, as we explain.

¶ 57    GreatBanc insists that it knew very little about the Diane Trust. In 2005, it received notice that a 20% interest in the Note was assigned to the Diane Trust, and instructions that henceforth it should direct 20% of any payments on the Note to the Diane Trust's separate account. It had copies of the assignments, which identified Dan and Diane as co-trustees of both the Dan Trust and the Diane Trust. However, it never had (and apparently did not request) copies of the trust agreements

themselves. It therefore did not know (and again, apparently did not ask) who was authorized to act on behalf of the Diane Trust. It certainly did not have any basis to think that Dan was authorized to act unilaterally on behalf of the Diane Trust. To the contrary, the assignments—the only record GreatBanc had of who was authorized to act for the trusts—included both Dan's and Diane's signatures as co-trustees of each trust, suggesting that both co-trustees' approval was necessary to authorize transactions.

¶ 58    What GreatBanc did know after 2005 was that the Diane Trust was a holder of 20% of the Note. Thus, GreatBanc owed the Diane Trust the same duties under the Note that it owed any other holder: to make regular monthly payments to the place directed by the Diane Trust, and ultimately to pay to the Diane Trust its share of any proceeds from the Note.

¶ 59    In 2009, GreatBanc nevertheless accepted instructions from Reed to divert the Diane Trust's share of monthly payments away from that trust's account and into what GreatBanc knew was Dan's personal account. Despite knowing that the Diane Trust was the holder of an interest in the Note, there is no evidence that GreatBanc made any effort to inquire whether this diversion was authorized by anyone acting for the Diane Trust. Similarly, in 2011, GreatBanc simply accepted instructions from Dan and Reed to release the Diane Trust's interest in the Note, without requiring any authorization from anyone acting for the Diane Trust. And as discussed earlier, there is no evidence that these actions were in fact authorized by anyone acting on behalf of the Diane Trust.

¶ 60    GreatBanc also argues that its acceptance of the 2009 instructions to divert the monthly payments owed to the Diane Trust to Dan's personal account instead was proper because, under the terms of the Note, "the holder" of the Note could designate a new place for payment to be made. But that language only permits each holder of an interest in the Note to direct the place of

payment for *that holder*'s interest. The Note does not say that any holder may direct the place of payment for *another holder*'s interest, and such a reading would be contrary to the laws of title and property rights. And although Dan was a co-trustee of the Diane Trust and theoretically could have been acting on its behalf in redirecting these payments, it is uncontroverted that (1) he was not doing so and instead was acting on behalf of the Dan Trust in directing the diversion, (2) Reed did not know of the Diane Trust and thus was not acting on its behalf when he relayed Dan's instructions, (3) neither Dan nor Reed ever purported to be acting for the Diane Trust, and (4) GreatBanc never inquired about whether the Diane Trust authorized this diversion of funds. Thus, the terms of the Note do not assist GreatBanc here.

¶ 61     For all of these reasons, the trial court erred in granting summary judgment in favor of the defendants on the ground that the Diane Trust authorized Dan's unilateral actions to divert and use the trust's assets as he did.

¶ 62          C. Issues Relating to Diane's Knowledge of the 2009 Diversion

¶ 63     The defendants argue that the trial court properly granted summary judgment on the claims related to the 2009 diversion of the Diane Trust's share of monthly payments on the Note, because certain defenses raised by the defendants—the statute of limitations and equitable estoppel or waiver—are incontestably established by the evidence. These defenses all turn on the factual question of whether and when Diane knew or should have known of the diversion. The trial court found that it was "unrebutted" that, as early as 2010, Diane "was getting statements from the bank account associated with the Diane Trust" and that thus she either knew or should have known of the diversion then.

¶ 64     Dan relies on this finding to argue that the claims relating to the 2009 diversion are untimely. In his motion for summary judgment, Dan first argued that those claims were untimely

on their face, because the limitations period for those claims is five years but the suit was not filed until 2016. Palm responded by asserting that the discovery rule applied. "The discovery rule postpones the start of the limitations period until a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused." *Henderson Square Condominium Ass'n v. LAB Townhomes, LLC*, 2015 IL 118139, ¶ 52. Palm pointed to Justin's deposition testimony that he did not discover the diversion until 2014. Thus, she argued, the suit was brought within five years of the time that a trustee of the Diane Trust first knew of the diversion. Dan rejoined that, Diane (as the initial trustee) knew or reasonably should have known of the diversion well before April 29, 2011, making these claims untimely. GreatBanc similarly relies on the trial court's finding to argue that Diane's knowledge of the diversions should preclude her claims against GreatBanc, asserting defenses of equitable estoppel and waiver.

¶ 65    As noted earlier, however, the evidentiary basis for the trial court's finding is unclear—the defendants have not identified any evidence that supports it, and our own review of the record has yielded no such evidence, let alone "unrebutted" proof. We review *de novo* all of the trial court's determinations in connection with summary judgment. *Gaylor*, 363 Ill. App. 3d at 547.

¶ 66    Regarding whether or when Diane knew or reasonably should have known of the diversion, the record is almost completely silent. In 2007, Diane was copied on an e-mail that contained an account number for the Diane Trust's account at The Private Bank. However, there is no evidence as to how that account was set up or even that Diane had the right to see the records for the account. Although it would not be uncommon for a bank to have records indicating to whom account statements were sent during a given period of time, no such records have been presented here. Palm testified that Diane was capable of reading and understanding bank records throughout her illness, but Palm did not know what, if any, bank records Diane actually saw. It is undisputed that

Diane was not copied on the 2009 e-mails directing the diversion of the Diane Trust's share of the monthly payments.

¶ 67    In considering the lack of any evidence that Dan told Diane directly about the diversion, we are also mindful that, although Dan and Diane were the co-trustees of the Diane Trust, Diane was its primary beneficiary, and thus Dan owed her a fiduciary duty to disclose relevant facts. In fact, if, as it appears, Dan failed to tell Diane about the diversion, his silence could amount to fraudulent concealment of a cause of action:

> "[I]t is the prevailing rule that, as between persons sustaining a fiduciary or trust or other confidential relationship toward each other, the person occupying the relation of fiduciary or of confidence is under a duty to reveal the facts to the plaintiff (the other party), and that his silence when he ought to speak, or his failure to disclose what he ought to disclose, is as much a fraud at law as an actual affirmative false representation or act; and that mere silence on his part as to a cause of action, the facts giving rise to which it was his duty to disclose, amounts to a fraudulent concealment ***." (Internal quotation marks omitted.) *Henderson Square*, 2015 IL 118139, ¶ 40.

Fraudulent concealment can be another basis for tolling the limitations period, if it prevents discovery of the cause of action. *Id.* ¶ 36.

¶ 68    Because we conclude that the trial court's finding that Diane knew or reasonably should have known of the diversion as early as 2010 is not supported by the record, we set it aside. And lacking that, the defendants have not shown that they are entitled to summary judgment on the claims arising from the 2009 diversion. "The question of when a party knew or reasonably should have known both of an injury and its wrongful cause is one of fact, unless the facts are undisputed

and only one conclusion may be drawn from them." *Id.* ¶ 52. Accordingly, the entry of summary judgment on these claims was error.

¶ 69                                   III. CONCLUSION

¶ 70     For the reasons stated, the judgment of the circuit court of Du Page County is reversed and the cause is remanded for further proceedings.

¶ 71     Reversed and remanded.

¶ 72     JUSTICE McLAREN, specially concurring in part and dissenting in part:

¶ 73     I have no quarrel with what the majority has related; I dissent because I do not believe it goes far enough.

¶ 74     The majority states:

> "Palm's third argument is that, even if the terms of the trust had authorized Dan to give away the trust's assets, and even if diverting and using those assets as he did were not a breach of Dan's fiduciary duty of loyalty, the transfers of the trust's assets were legally ineffective because at no point did anyone purporting to act on behalf of the Diane Trust— including Dan—authorize those transfers. The record supports this argument. In pleading his affirmative defenses, Dan stated that he redirected the monthly payments in 2009 while acting as co-trustee of the *Dan Trust*, not the Diane Trust. There is no evidence that Dan was acting on behalf of the *Diane Trust* in directing the diversion of the monthly payments of 20% away from the Diane Trust account and into Dan's personal account." *Supra* ¶ 55.

That being said, I believe partial summary judgment, at minimum, should have been granted to Palm.

¶ 75     Additionally, the majority relates:

"Because we conclude that the trial court's finding that Diane knew or reasonably should have known of the diversion as early as 2010 is not supported by the record, we set it aside. And lacking that, the defendants have not shown that they are entitled to summary judgment on the claims arising from the 2009 diversion. 'The question of when a party knew or reasonably should have known both of an injury and its wrongful cause is one of fact, unless the facts are undisputed and only one conclusion may be drawn from them.' *Id.* Accordingly, the entry of summary judgment on these claims was error." *Supra* ¶ 69.

Based on this record, the majority's determination, coupled with the implications of the Dead-Man's Act (735 ILCS 5/8-201 (West 2016)), should have resulted in summary judgment being granted to Palm against defendants.

¶ 76     I agree that the cause should be remanded. However, I submit that it should be remanded only to determine the amount of Palm's damages.

2022 IL App (2d) 210057

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 16-L-389; the Hon. Angelo J. Kappas, Judge, presiding. |
| **Attorneys for Appellant:** | David C. Blickenstaff and David C. Giles, of ArentFox Schiff LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Joseph P. Carlasare, Michael Resis, and Glen E. Amundsen, of SmithAdmundsen LLC, of Chicago, for appellee Daniel A. Sergi.<br><br>Ryan C. Williams and Gregory A. Kubly, of Akerman, LLP, of Chicago, for other appellee. |